# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT GARDNER,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 17-4476** |
| | : | |
| **SEPTA,** | : | |
| *Defendant.* | : | |

## OPINION

Plaintiff, Robert Gardner, brought this action against his current employer, Defendant, Southeastern Pennsylvania Transportation Authority ("SEPTA"), under the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"). Plaintiff alleges that he is an individual with a disability for the purposes of the ADA and PHRA, and that Defendant violated his rights by not granting him a reasonable accommodation, by failing to engage in the interactive process, and by retaliating against him because of his claimed disability. Currently before the Court is Defendant's Motion for Summary Judgment and Memorandum of Law (ECF No. 40), Plaintiff's Memorandum of Law in Opposition to the Motion (ECF No. 43), Defendant's Reply Memorandum of Law in Further Support of its Motion (ECF No. 44), and Plaintiff's Sur-reply in Further Opposition to the Motion (ECF No. 45).

For the following reasons, the Court grants Defendant's Motion for Summary Judgment in the accompanying Order.

1

# I.     BACKGROUND

Plaintiff began working for SEPTA as a bus operator in January 2014. ECF No. 40-2 ¶ 2.  In March 2014, Plaintiff submitted an application requesting that SEPTA transfer him from a bus operator to a rail operator. ECF No. 40-4 at 24. SEPTA entered into a collective bargaining agreement ("CBA") with Transport Workers Union Local 234 City Transit Division ("Local 234"). ECF No. 40-5; ECF No. 40-6.  As a bus operator, Plaintiff was a member of Local 234, and as a SEPTA employee, Plaintiff was subject to the CBA. ECF No. 40-4 at 17.  Section 305(e) of the CBA governs Plaintiff's application for transfer to rail operator, which states that such transfers are granted based on the applicant's seniority within his/her division. ECF No. 40-5 at 30.[1]

---

[1] **Section 305. Transfers. (e)**  Vacant or new jobs not filled by promotion will be filled by transfer of employees from other jobs, groups, or locations, (depots) within the same division who meet all qualifications for the job and are fully qualified to perform all of the work of the job to which the transfer is to be made.  Such transfers will be made from among those employees so qualified whose applications, made as provided in subsection (a), are on file at the time the vacancy or new job occurs, and will be made in the order of division seniority.  If such qualified employees are not available within the same division, the vacant or new jobs will be filled by transfers of employees from other divisions within the same department who meet all qualifications for the job and are fully qualified to perform all of the work of the job to which the transfer is to be made.  Such transfer will be made from among those employees so qualified whose applications, made as provided in subsection (a), are on file at the time the vacancy or new job occurs; and will be made in the order of department seniority.  If such qualified employees are not available within the same department, the vacant or new jobs will be filled by transfer from among those employees so qualified whose applications, made as provided in subsection (b), are on file at the time of vacancy or new job occurs; and such transfers will be made in the order of Authority seniority.  Whenever there are no qualified employees on the transfer files, the Authority will advertise any maintenance job for seven (7) days before filling it with a newly hired employee.  Among employees who file for transfer as a result of said advertisement, the selection from among qualified applicants will be made in the same order as if they had filed transfers as set forth heretofore.

On June 4, 2015, Plaintiff was involved in a work-related motor vehicle accident and suffered injuries as a result. ECF No. 40-2 ¶ 3.  He received medical treatment for his injuries on June 5, June 10, and June 17, 2015, and filed a workers' compensation claim in connection therewith. ECF No. 40-2 ¶ 4.  On June 17, 2016, following his treatment, the doctors cleared Plaintiff to return to full-duty work, without restrictions. ECF No. 40-7 at 2-3, 9-12.

On July 28, 2015, Plaintiff underwent a follow-up evaluation with Dr. Lawrence Axelrod, Medical Director of WORKNET Occupational Medicine. ECF No. 40-7 at 16.  This time, Dr. Axelrod issued a Physical Capacities Form that cleared Plaintiff for work, with restrictions. *Id.*  In contrast to Plaintiff's June 17, 2015 medical evaluation, Dr. Axelrod opined that Plaintiff was "OK to operate rail vehicles but not bus." *Id.*  In a separate report, Dr. Axelrod pointed out that Plaintiff "requested [that Dr. Axelrod] continue to medically disqualify him from driving a bus and [Plaintiff] requested that [Dr. Axelrod] allow [Plaintiff] specifically to operate a rail vehicle (trolley) ... considerations must be given to the possibility of intentional manipulative type behaviors." ECF No. 40-7 at 5-7. SEPTA decided to assign Plaintiff to a temporary light-duty position. ECF No. 40-7 at 14.

On August 5, 2015, Plaintiff submitted a letter to SEPTA requesting an ADA accommodation for his injuries. ECF No. 43-11 at 46. In that letter, Plaintiff stated:

> [a]fter being injured on duty June 04, 2015, I specifically request medical disqualification from the position of Bus Operator, because I cannot perform the essential elements of the job with or without reasonable accommodation. Specifically, I am no longer medically able to perform frequent repetitive arm/hand motion or frequent gross manipulation, which are physical requirements of the Bus Operator position.

*Id.*[2] Attached to Plaintiff's August 5, 2015 letter was a note from Dr. Mark Allen, Plaintiff's personal physician, in which Dr. Allen stated that Plaintiff has been "under my care after an injury while at work on June 4, 2015 ... Estimated length of employee disqualification from job notes that he is capable of driving a trolley car only." *Id*. at 48.[3]

On August 11, 2015, Dr. Axelrod conducted another follow-up evaluation with Plaintiff in order to assess his ability to return to work. ECF No. 40-7 at 5-7. In his subsequent report, Dr. Axelrod stated, "[Plaintiff] had no change in his overwhelmingly axial neck complaints of pain with no radicular quality symptoms

---

[2] At ECF No. 43-1 ¶ 19, Plaintiff states, "On August 5, 2015, Plaintiff requested accommodation under the ADA from SEPTA because of his cervical injuries dating back to 2014 requesting that he be reassigned to another permanent position that would accommodate his disability, such as Trolley Operator and supported his request with an August 5, 2015 letter from Dr. Allen." No where in Plaintiff's letter (Exhibit P-48) does Plaintiff state "cervical injuries dating back to 2014."

[3] No where in Dr. Allen's letter (Exhibit P-5) does Dr. Allen state "cervical injuries dating back to 2014."

to the upper extremities ... [h]e was working in a modified capacity" and Plaintiff asked that Dr. Axelrod reproduce the same restrictions as Dr. Allen. *Id*. at 7. Despite Plaintiff's request, however, Dr. Axelrod opined that Plaintiff was capable of returning to his regular duties as a bus operator:

> At the conclusion of the office visit dated 8/11/15 I informed [Plaintiff] that since he had axial neck complaints of pain without radicular quality features, in my professional medical opinion within a reasonable degree of medical certainty he was immediately physically capable of returning to his regular full duty position driving a bus for SEPTA Buses with no restrictions or accommodations."

*Id*. Plaintiff disagreed with Dr. Axelrod's opinion. *Id*.

On September 2, 2015, Plaintiff completed a "SEPTA Request for Reasonable Accommodation" form and delivered it to SEPTA's ADA Compliance Consultant for its Equal Employment Opportunity/Affirmative Action and Employee Relations ("EEO/AA/ER") Department, Jacqueline Hopkins. ECF No. 40-2 ¶ 5. Plaintiff indicated on the form that his impairment began on June 4, 2015, and requested that SEPTA transfer him to a rail operator position because he believed it would cause him less physical stress. ECF No. 40-7 at 22-24; ECF No. 40-4 at 15-16. At the time, Plaintiff was number 35 out of 37 on the seniority list for bus-to-rail transfers. ECF No. 40-7 at 62.

On September 4, 2015, Ms. Hopkins discussed Plaintiff's accommodation request with him over the telephone and Plaintiff memorialized that conversation in a follow-up e-mail. ECF No. 40-7 at 65-66. Ms. Hopkins explained the

difference between identifying a reasonable accommodation and the transfer

process under the CBA. *Id*. at 65.

On September 17, 2015, SEPTA received a note from Dr. Allen that cleared

Plaintiff to return to full work duties as a bus operator. *Id*. at 77.  Specifically, Dr.

Allen's note stated, "[Plaintiff] is cleared to return to full duties at work" and is

dated "9/16/15." *Id*.  In response, Ms. Hopkins asked Plaintiff to explain the

discrepancy between his physician's reports and his ability to safely perform the

essential functions of his job as a [bus] operator, with or without accommodations.

*Id*. at 75.  Plaintiff responded on September 30, 2015, by submitting two additional

Physical Capacities Forms that restated Dr. Allen's prior opinion—that he was

only capable of driving a rail car, but not a bus—as well as a new report stating

that Plaintiff's condition was "[u]nchanged." *Id*. at 79-80; 82-83.  Meanwhile, on

September 23, 2015, Plaintiff e-mailed Ms. Hopkins and described his injuries as

follows:

> I have disabilities as a result of being permanently disabled and/or
> limited in range of motion resulting from both the congenital fusion of
> my thoracic spine (T1-T2) and the surgical fusion of my cervical (C4-
> C7) spine that required implantation of a prosthetic device on
> November 17, 214 (sic) and covered under the ADA, which I have
> provided you sufficient evidence to support, in the form of CT scan …

ECF No. 43-11 at 22.

On September 29 and September 30, 2015, Plaintiff submitted two SEPTA

Operator's Accident/Incident Reports asserting that he was unable to operate a bus

safely because of physical conditions related to the June 4, 2015 accident to SEPTA's Assistant Director for the Southern District, Thomas Ropars. ECF No. 40-7 at 85; ECF No. 40-8 at 2. Mr. Ropars e-mailed Plaintiff and explained that his reasonable accommodation request was not properly the subject of an accident or incident report; however, because Plaintiff stated in his report that it was unsafe for him to drive a bus, he must determine Plaintiff unfit for duty and place him on sick leave per SEPTA's Fitness for Duty policy. ECF No. 40-8 at 4-6. According to SEPTA's Fitness for Duty policy, "[e]mployees must not perform any service while affected by any condition that could impair their ability to perform their duties properly." *Id*. at 8. In such cases, "[a] medical certificate stating the nature of the sickness and certifying that the employee is fit for duty must be produced, if required by the employee's supervisor, before the employee may return to work." *Id*. According to Section 501(n) of the CBA, an employee returning to work after an absence due to illness or injury may do so subject only to the approval of SEPTA's Medical Department. ECF No. 40-6 at 26. As such, Mr. Ropars advised Plaintiff that before he could return to work he would need to provide the medical clearances required by SEPTA's Fitness for Duty policy and CBA Section 501(n). ECF No. 40-7 at 60.

The CBA further provides that union members who cannot report to work because of injury or sickness must go on sick leave; therefore, until Plaintiff

obtained the necessary medical clearances and was permitted to return to work, he was placed on sick leave. ECF No. 40-6 at 24-27. While on sick leave, Plaintiff received all sick benefits to which he was entitled under the CBA. ECF No. 40-8 at 10-22.

On October 1, 2015, Ms. Hopkins wrote Plaintiff to advise that she received the additional material he submitted and invited Plaintiff to meet with SEPTA's Medical Director, Dr. Jeffrey Erinoff, SEPTA's Director of EEO/AA & Employee Relations, Lorraine McKenzie, and herself. *Id*. at 24. On the same day, Plaintiff dual-filed a charge of discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission. *Id*. at 26-28.

On October 5, 2015, Gardner filed a grievance against SEPTA through Local 234. *Id*. at 30. The grievance stated, "[t]he Union protests the Authority not granting reasonable accommodation request to Robert Gardner, #17542, for his disability." *Id*.

On October 7, 2015, Plaintiff attended an interactive process meeting with Ms. Hopkins, Ms. McKenzie, and Dr. Erinoff. *Id*. at 32. On Plaintiff's behalf, Ms. Hopkins investigated how much longer Plaintiff "could expect to remain on those transfer lists for the trolley position." *Id*. at 34. On October 19, 2015, SEPTA's Labor Relations Manager, Bud Scott, advised Ms. Hopkins by e-mail that Local

234 President Willie Brown was opposed to circumventing the provisions under the CBA to allow Plaintiff's transfer to rail operator. *Id.*[4]

On October 28, 2015, Ms. Hopkins wrote to Plaintiff and summarized the history of the interactive process to date. *Id.* at 36-50. Ms. Hopkins informed Plaintiff that due to the conflicting medical evaluations he had previously submitted, SEPTA intended to rely on the upcoming Independent Medical Examination ("IME") scheduled for October 21, 2015 for Plaintiff's pending workers' compensation claim. *Id* at 36-37.

On October 21, 2015, Dennis P. McHugh, D.O. conducted the IME, which included a review of Plaintiff's medical history and a physical examination, and he produced a report of his findings. ECF No. 40-9 at 2-7. Dr. McHugh cleared Plaintiff for full duty work without restrictions as a SEPTA bus operator and stated:

> [I]t is my medical opinion, within a reasonable degree of medical certainty, that [Plaintiff] is fully recovered from the cervical and lumbar sprains and strains and that he needs no further care. It is my medical opinion, within a reasonable degree of medical certainty, that

---

[4] At ECF No. 43-1 ¶ 39, Plaintiff states, "On October 13, 2015, SEPTA's Labor Relations Manager, Bud Scott, spoke to Local 234's Executive Vice-President, Brian Pollitt, who advised Mr. Scholl that the Union supported transferring Plaintiff to the position of a Trolley Operator, in spite of the seniority provision, to accommodate Plaintiff's disability," without citation. Defendant's Exhibit 29 (ECF No. 40-8) shows an e-mail from Mr. Scott to Ms. Hopkins. Mr. Scott specifically wrote, "Jackie, On 10/13/15, I spoke to Union Vice President Brian Pollitt regarding accommodating Robert Gardner by transferring him to Elmwood as a trolley operator. Brian Pollitt advised that he supported transferring Mr. Gardner and circumvent the existing list. However, Joe Horbury advised that the Union President Willie Brown was opposed to the transfer."

[Plaintiff] could return to full duty work without restrictions as a
SEPTA bus driver immediately.

*Id*. at 6.

On November 19, 2015, SEPTA's Vocational Consultant, Jocelyn Jervis,

notified Plaintiff that he was permitted to return to work on December 3, 2015,

pending a medical-fitness-for-duty examination pursuant to SEPTA's Fitness for

Duty policy and Section 501(n) of the CBA. ECF No. 40-9 at 9.

On December 3, 2015, Ms. Hopkins wrote to Plaintiff informing him that

based on Dr. McHugh's conclusions in his IME report, SEPTA determined that

Plaintiff did not have a disability under the ADA and; therefore, it would not grant

his request for ADA accommodation. ECF No. 40-2 at ¶ 7.

On January 27, 2016, Plaintiff submitted another request for accommodation

and supported his request with the same documents from his September 2, 2015

submission seeking the same accommodation. *Id*. at 13-23. On February 10, 2016,

SEPTA received another note from Dr. Allen stating that Plaintiff was "[c]leared to

return to normal duties," dated "2/10/16." *Id*. at 25. And, on February 22, 2016,

Ms. Hopkins denied Plaintiff's second request for accommodation. *Id*. at 27.

On April 11, 2016, SEPTA transferred Plaintiff to trolley operator based on

seniority. *Id*. at 29-33. On June 28, 2017, SEPTA promoted Plaintiff to

Supervisor, Control Center – CCT. *Id*. at 35. On October 17, 2017, SEPTA

promoted to Transportation Manager. *Id*. at 37. On June 12, 2018, SEPTA

promoted Plaintiff to Control Center Manager – Bus. ECF No. 40-4 at 2. Plaintiff is employed by SEPTA in the same position, today. ECF No. 40-2 at ¶ 1.

## II.    STANDARD

Summary judgment is appropriate if the moving party shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The material facts must be viewed in the light most favorable to the nonmoving party *only if* there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248-49.

The initial burden is on the moving party to show the absence of a genuine dispute of material fact. *See Celotext Corporation v. Catrett*, 477 U.S. 317, 323 (1986) (the burden on the moving party is one that involves "identifying the portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits demonstrating the absence of a genuine issue of a material fact."). As the Supreme Court has emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts … Where the

record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'" *Scott*, 550 U.S. at 380

(quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586–587 (1986) (footnote omitted)).  While the moving party bears the initial

burden, meeting this obligation shifts the burden to the non-moving party who

must "set forth specific facts showing that there is a genuine issue for trial."

*Anderson*, 477 U.S. at 250.

 "[T]he mere existence of some alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." *Am. Eagle Outfitters*

*v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–248 (1986)).  "When opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts

for purposes of ruling on a motion for summary judgment." *Id*.; *See Losch v.*

*Borough of Parkesburg, Pa.*, 736 F.2d 903, 909 (3d Cir. 1984) (instructing that

"conflicts of credibility should not be resolved on a hearing on the motion for

summary judgment unless the opponent's evidence is too incredible to be believed

by reasonable minds.").  As such, summary judgment must be entered, "'after

adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Marten v. Gordon*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## III. DISCUSSION

Plaintiff's Complaint contains causes of action under the ADA and the PHRA. *See generally* ECF No. 1. Plaintiff alleges Defendant is liable for discrimination and retaliation in violation of the ADA by claiming he was a qualified individual with a disability, his request for a reasonable accommodation was summarily denied without any meaningful interactive process, and that the close temporal proximity of Plaintiff's request for accommodation and his being placed on sick leave indicates that SEPTA's actions were for untrue and pretextual reasons. *Id*. SEPTA moves for summary judgment on all claims. ECF No. 40.

### A. The Court grants summary judgment for SEPTA on Plaintiff's disability discrimination claims under the ADA and the PHRA.

SEPTA argues Plaintiff has failed to raise a genuine issue of fact as to whether Plaintiff suffered from a disability recognized under the ADA and that SEPTA discriminated against him because of his disability. Plaintiff argues genuine issues of material fact exist that preclude summary judgment. The Court disagrees and finds that Plaintiff did not have a disability under ADA, and, as a result, grants SEPTA's motion for summary judgment.

1. *Disability discrimination claims are analyzed under a burden-shifting framework.*

The ADA bars an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Turner v. Hershey Chocolate USA*, 440 F.3d 604, 607 (3d Cir. 2006) (The purpose of the ADA is to "prevent otherwise qualified individuals from being discriminated against in employment based on disability.").

In assessing claims of discrimination based on disability, the Third Circuit applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). This framework places the initial burden on a plaintiff to establish a *prima facie* case of discrimination. *Id.* If the plaintiff can establish a *prima facie* case of discrimination, the burden shifts to the employer to "offer evidence of a legitimate nondiscriminatory reason for the action." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (internal quotation marks omitted) (citing *McDonnell Douglas*, 411 U.S. 792). If the defendant meets its burden, "the presumption of discrimination raised by the *prima facie* case is rebutted, and plaintiff must show by a preponderance of the evidence that the defendant's explanation is actually a pretext for discrimination." *Mercer v. Se. Pennsylvania Transit Auth.*, 26 F. Supp.

3d 432, 445 (E.D. Pa. 2014), *aff'd sub nom. Mercer v. SEPTA*, 608 F. App'x 60 (3d Cir. 2015) (citing *Anderson*, 621 F.3d at 271).

### 2. *Plaintiff fails to establish a prima facie case for discrimination.*

SEPTA argues summary judgment is appropriate because Plaintiff has not made out a *prima facie* case of discrimination based on his disability. First, to establish a *prima facie* case, Plaintiff must show: (1) that he is a disabled person within the meaning of the ADA; (2) that he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) that he suffered an adverse employment action because of his disability. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999); *see also Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

With respect to the first element, Plaintiff has the "burden of demonstrating that he has a disability under the ADA before any claim can proceed to trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). At summary judgment, [he] cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show a genuine issue exists for trial. *Id.*; *see also Celotex Corp.*, 477 U.S. at 324. Plaintiff can establish he has a disability under ADA[5] by showing he has a "'a physical or mental impairment that

---

[5] Courts previously considered the ADA and the PHRA coextensively, the PHRA was not amended following the passage of the ADAAA, which explicitly expanded the list of "major life

substantially limits [a] major life activit[y],' has 'a record of such an impairment,'

or is 'regarded as having such an impairment.'" *Mills v. Temple Univ.*, 869 F.

Supp. 2d 609, 620 (E.D. Pa. 2012) (quoting 42 U.S.C. § 12102(2)(A), (B), (C)).  In

order to determine whether a physical or mental impairment limits a major life

activity, the court must evaluate the "specific life activities that the plaintiff claims

---

activities," and explained that the definition of disability was to be broadly construed, thus requiring courts to analyze disability under the ADA and PHRA separately.  "[W]hile the ADAAA lowered the standard for finding a disability under the ADA, the PHRA has not been similarly amended." *Kieffer v. CPR Restoration & Cleaning Serv., LLC*, 200 F. Supp. 3d 520, 533 (E.D. Pa. 2016), aff'd sub nom. *Kieffer v. CPR Restoration & Cleaning Servs., LLC*, 733 F. App'x 632 (3d Cir. 2018).  The majority of courts in the Eastern District of Pennsylvania have concluded that "because the Pennsylvania legislature has not enacted a similar amendment to the PHRA, the disability prong of discrimination analysis under the PHRA should be analyzed in the same manner as pre-ADAAA claims.'" *Sowell v. Kelly Servs., Inc.*, 139 F. Supp. 3d 684, 704 (E.D. Pa. 2015) (quoting *Berkowitz v. Oppenheimer Precision Products, Inc.*, No. 13–4917, 2014 WL 5461515, at 7 (E.D. Pa. Oct. 28, 2014)).  "In order to establish actual disability under the PHRA, a plaintiff must demonstrate that she has 'actual mental or physical impairment that substantially limits one or more major life activities.'" *Id.* (quoting *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir.2012)).  According to pre-ADAA EEOC regulations, "'substantially limits' means '[u]nable to perform a major life activity that the average person in the general population can perform' or '[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 782–83 (3d Cir. 1998) (quoting pre-ADAAA EEOC regulations 29 C.F.R. § 1630.2(j)(1)(i),(ii)).  In considering whether a major life activity has been substantially limited, courts were to consider "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of [the impairment] or resulting from the impairment."  *Id.* at 783 (quoting pre-ADAAA EEOC regulations 29 C.F.R. § 1630.2(j)(2)(i)–(iii)).  Furthermore, under these pre-ADAA EEOC regulations, major life activities included "sitting, standing, lifting, and reaching."  *Id.* at 783 n. 2. (citing pre-ADAAA EEOC regulations 29 C.F.R. Pt. 1630, App. § 1630.2(i)).  Therefore, any reference to ADA includes and is analyzed under ADAAA's broader interpretation of "disability."  And, because Plaintiff fails to establish he was disabled at a *prima facie* level under ADA (the broader post-amendment interpretation), he fails, *a fortiori*, under PHRA (the narrower pre-amendment interpretation).

are affected," determine whether they are "major life activit[ies]" and whether they are limited by the plaintiff's impairment. *Id.*

With the passage of the ADA Amendments Act of 2008 ("ADAAA"), Congress expanded the statute's non-exhaustive list of "major life activities" and declared that "[t]he definition of disability shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." *Id.* (quoting Pub.L. No. 110–325, §§ 2(b)(1)-(6), 3(2)(a), § 4(a), 122 Stat. 3553, 3555). "Whether an individual is substantially limited in performing a major life activity is a question of fact." *Sowell v. Kelly Servs., Inc.*, 139 F. Supp. 3d 684, 698 (E.D. Pa. 2015). The ADAAA states that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C.A. § 12102.

Plaintiff argues that his disability "limits a major life activity" and that he established a "record of" his disability. ECF No. 43 at 15. Plaintiff described his disability as follows:

> "I have disabilities as a result of being permanently disabled and/or limited in range of motion resulting from both the congenital fusion of my thoracic spine (T1-T2) and the surgical fusion of my cervical (C4-C7) spine that required implantation of a prosthetic device on November 17, 2014 (sic) and covered under the ADA, which I have provided you sufficient evidence to support, in the form of CT scan…"

ECF No. 43-11 at 22. Dr. Allen described Plaintiff's diagnosis as a "[c]ervical and lumbosacral spine sprain and strain." ECF No. 43-10 at 26. Dr. Axelrod and other treating doctors at WORKNET Occupational Medicine described Plaintiff's diagnosis as "Cervical Strain; Lumbar Strain." ECF No. 40-7 at 2, at 9. However, the record is absent of any specific reference to a major life activity that Plaintiff's disability limits. Instead, the only activity Plaintiff claims is limited is his ability to work as a bus operator.

SEPTA argues Plaintiff fails to establish a disability because, as of the date he requested an accommodation, two doctors had previously cleared him to return to work as a bus operator. ECF No. 40 at 15. Specifically, SEPTA points to the fact that Plaintiff was cleared to return to full work duties by both his personal physician, Dr. Allen, as well as the independent orthopedic surgeon, Dr. McHugh, at the times he requested accommodation. *Id.* Plaintiff submitted his accommodation request on September 2, 2015. ECF No. 40-2 ¶ 5. SEPTA asserts that Dr. Allen's September 16, 2015 note "clear[ing] [Plaintiff] to return to full duties at work" after he requested an accommodation "conclusively demonstrate[s] that [Plaintiff] was not disabled." ECF No. 40 at 15.

Plaintiff argues Dr. Allen's September 16, 2015 note does not specifically say he could return to "full-duty as a bus operator" and, instead, relies on Dr. Allen's September 30, 2015 supplement which stated, "'No frequent repetitive

arm/hand motion', 'no frequent gross manipulation' 'Restrictions expected to be permanent'[sic]." ECF No. 43 at 7 (emphasis removed).  Based on the two notes from Dr. Allen, Plaintiff argues that "[i]t can be reasonably implied that Dr. Allen's September 16, 2015 note assumed Plaintiff was assigned to full duty as a rail operator since [Dr. Allen] previously requested that Plaintiff be assigned to rail operation only." *Id*. at 8.

Plaintiff contests that there is a genuine issue of material fact as to whether he is disabled because Dr. Allen's two medical reports contain conflicting opinions insofar that one says he is incapable of operating a bus, while the other says he is capable of returning to full work duties. *Id*. at 17.  The discrepancy in Dr. Allen's two reports, however, is inconsequential and blatantly contradicted by the record. It is undisputed that the doctors who analyzed Plaintiff's injuries uniformly concluded that Plaintiff could return to his full work duties *prior to* the date SEPTA denied his accommodation request.

Furthermore, Plaintiff fails to identify in the record "specific life activities" his disability affects.  Consequently, the Court is unable to analyze whether they are "major life activities" and whether his disability limits those activities. Plaintiff's own declaration fails to identify a major life activity his disability allegedly impairs. *See* ECF No. 43-3 at 1-6.  Plaintiff's own description to Ms. Hopkins fails to identify a major life activity his disability allegedly impairs. ECF

No. 43-11 at 22. Accordingly, Plaintiff has failed to go beyond his pleadings and provide some evidence that would show a genuine issue exists for trial.

Deep within the record lies a brief reference to what the courts might consider life activities. The doctors' notes in reference to Plaintiff's follow-up visits at WORKNET Occupational Medicine state that Plaintiff

> specifically denied any pain, numbness, weakness of the arms, forearms or hands. He had no difficulties with balance and no intestinal or urinary complaints such as incontinence or retention and he had no paresthesias of the anal or genital regions. He was doing full duty tasks without difficulty and he was attending physical therapy.

ECF No. 40-7 at 5-7. However, Plaintiff's reports, outlining his admissions, from his many examinations give no indication that any of these—what could be considered—life activities were at all limited.

Plaintiff was in a work-related vehicle accident on June 4, 2015. ECF No. 40-2 ¶ 3. Over the course of five months, doctors monitored Plaintiff's injuries, prescribed medication and physical therapy, and the record demonstrates, without room for dispute, Plaintiff was cleared to return to full work duty – at the latest – October 21, 2015. At most, lending Plaintiff the broadest interpretation of disability under the ADA, the record reflects a temporary injury for which Plaintiff received treatment and recovered. It is well settled, however, that "a temporary, non-chronic impairment of short duration is not a disability covered by the ADA." *Sampson v. Methacton Sch. Dist.*, 88 F. Supp. 3d 422, 435 (E.D. Pa. 2015) (citing

*Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 380 (3d Cir. 2002) (citation omitted)).

Thus, an injury like Plaintiff's, involving several months of limitation without long-term or permanent effect, is not a disability under the ADA. *Id*. at 436 (citing *e.g.*, *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274–75 (3d Cir. 2012) (finding that temporary lifting limitations that were removed four months after their inception "are the very definition of such a non-chronic impairment"); *see also Bolden v. Magee Women's Hosp. of Univ. of Pittsburgh Med. Ctr.,* 281 Fed.Appx. 88, 90 (3d Cir. 2008) (finding proper district court's determination that no reasonable juror could have concluded the plaintiff had a disability where, after four months of an arm injury, the plaintiff was able to resume many activities and was fully able to resume all activities after seven months).

SEPTA cites *Parrotta v. PECO Energy Co.*, 363 F. Supp. 3d 577 (E.D. Pa. 2019) as persuasive support. The employee in *Parrotta* underwent surgery on his foot that temporarily restricted his ability to work. *Id*. Following treatment, doctors cleared the employee for "full duty work ... with no restrictions, no [] medications, and no further treatment." *Id*. The employee was left to rely only on his own testimony to establish his disability. *Id*. Judge Kearney opined, "[i]f we allow an employee to establish a disability relying solely on his own testimony, there would be no reasonable limit to a 'disability' under the [ADA]." *Id*.; *see also Rocco v. Gordon Food Service*, 998 F. Supp. 2d 422 (W.D. Pa. 2014) (at the time

delivery driver employee was terminated, he was cleared to resume to work ...
without restriction, ... no reasonable jury could conclude that plaintiff meets the
definition of disabled, even ... ADAAA).

As described in *Parrotta*, Plaintiff offers no record evidence other than his
own testimony to establish his disability.  In contrast, the record is replete with
evidence suggesting that he did not suffer a disability.  By June 17, 2015, less than
two weeks after Plaintiff's accident, three different doctors examined Plaintiff and
all three cleared Plaintiff to return to full-duty work. *See* ECF No. 40-7 at 2-3, 9-
12.  Later, Plaintiff complained to one doctor that he had "stiffness and soreness in
his neck whenever he had to reach forward and push a niller [sic] device located on
the dashboard to raise and lower the height of the bus and he also had soreness in
his neck whenever the bus hit a bump in the road." ECF No. 40-7 at 5.  Plaintiff
requested that he be removed from driving a commercial bus and the doctor
complied. *Id*.  Any reference from any doctor in the record who mentioned "rail
operator" either qualified his or her statement with "at Plaintiff's request" or fully
cleared Plaintiff shortly thereafter.  Here, Plaintiff goes a step further, like the
employee in *Parotta*, he self-diagnoses and he self-prescribes.  Nevertheless, by
October 21, 2015, the IME results indisputably confirmed—while taking into
consideration all of Plaintiff's prior medical history—that Plaintiff recovered and

"could return to full duty work without restrictions as a SEPTA

bus driver immediately." ECF No. 40-9 at 2-7.

Next, Plaintiff argues he "has presented sufficient medical records relating to

his August 2014 accident, including a November 17, 2014 surgical procedure that

is the basis of his disability" and "[a] reasonable jury following the Court's

instructions as provided in the Third Circuit Model Civil Jury Instructions can

certainly conclude that Plaintiff is a qualified disabled person under the ADA after

reviewing Dr. Allen's medical reports, the November 17, 2014 operative reports[],

and testimony from Dr. Allen at trial regarding his diagnosis and requests for

accommodation presented on behalf of Plaintiff." ECF No. 43 at 15.

This Court disagrees. Plaintiff fails to establish a "record of" impairment.

"Record of impairment" claims protect individuals who suffer discriminatory

actions based upon a documented history of disability, and a plaintiff relying upon

a record of impairment must establish a history of a condition that substantially

limits a major life activity. *See Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 436-37

(3d Cir. 2009). To establish a record of impairment, Plaintiff begins with his non-

work-related accident and surgery in 2014. *Id.* at 5.[6] Meanwhile, Plaintiff offers

_____

[6] In his brief opposing summary judgment, Plaintiff cites to a "non-work related motor vehicle accident from August 2014, where he was diagnosed with herniated cervical disc, impinging on his spine, and cervical radiculopathy." ECF No. 43 at 5. In support, Plaintiff cites to Exhibit P-3, U.S. Department of Labor Certification of Health Care Provider for Employee's Serios Health Condition (Family and Medical Leave Act) dated March 4, 2015 and an Operative Report dated November 17, 2014 of his "anterior cervical discectomy and fusion." Plaintiff offers no

no information to indicate SEPTA was aware of Plaintiff's surgery prior to his June 4, 2015 accident. Plaintiff was working as a bus operator without complaint from January 2014 until—at a minimum—March 2015, when he requested intermittent leave under the Family and Medical Leave Act. *See generally* ECF No. 43-10 at 21-24. Even when accepting these facts as proven by the Plaintiff, the record only supports the June 4, 2015 accident as SEPTA's first documented notice of Plaintiff's purported impairment. The only other possible indication in the record is Plaintiff's application for transfer to rail in March 2014. However, Plaintiff submitted that request in normal due course, not as an ADA accommodation for a disability. Therefore, Plaintiff has failed to provide support for his argument that he established a "record of" a disability under the ADA.

Furthermore, even if Plaintiff showed some "record of" an impairment, for all of the reasons discussed above, he does not present evidence that his record of a disability limits a major life activity. Again, without as much as identifying a limitation, Plaintiff cannot establish it is more likely than not he created a "record of" having a disability that limits a major life activity.

It is not for a jury, or the Court, to meet Plaintiff's burden for him. At summary judgment, Plaintiff cannot rely on unsupported allegations; he must go

---

connection between the two documents. Nowhere located in Exhibit P-3 does the doctor refer to P-52. Moreover, Plaintiff offers no evidence that P-52 was submitted with P-3, let alone ever recorded by SEPTA.

beyond pleadings and provide some evidence that would show a genuine issue exists for trial. Here, the evidence Plaintiff offers to satisfy the law's lowest burden falls woefully short. An injury that does not cause a physical or mental impairment severe enough to limit a major life activity is not a disability under the ADA. *See, e.g., Sampson v. Methacton Sch. Dist., 88 F. Supp. 3d 422, 436 (E.D. Pa. 2015)* (citing *Macfarlan v. Ivy Hill SNF, LLC,* 675 F.3d 266, 274–75 (3d Cir.2012) (finding that temporary lifting limitations that were removed four months after their inception "are the very definition of such a non-chronic impairment"); *Bolden v. Magee Women's Hosp. of Univ. of Pittsburgh Med. Ctr.,* 281 Fed.Appx. 88, 90 (3d Cir.2008) (finding proper district court's determination that no reasonable juror could have concluded the plaintiff had a disability where, after four months of an arm injury, the plaintiff was able to resume many activities and was fully able to resume all activities after seven months); *Ragusa v. Malverne Union Free School Dist.,* 381 Fed.Appx. 85, 88 (2d Cir.2010) (affirming entry of summary judgment in favor of defendant employer because plaintiff teacher failed to raise a jury question that employer regarded her as disabled as opposed to ineffective). Therefore, because Plaintiff fails to demonstrate he has a disability under the ADA the balance of Plaintiff's claims cannot proceed to trial as a matter of law.

i. Even if Plaintiff were able to establish a disability, Plaintiff fails to show he is a "qualified individual" under the ADA.

Even if this Court agreed with Plaintiff and determined that there was an issue of material fact as to whether he was a disabled person within the meaning of the ADA, he cannot establish that he was qualified to perform the essential functions of his job.

A "qualified individual" under the ADA is defined as one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 1211(8). The burden is on a plaintiff to show that he is a "qualified individual." *Buskirk v. Apollo Metals*, 307 F.3d 160, 168 (3d Cir. 2002). In order to determine whether someone is a qualified, the Third Circuit uses a two-part test. *Gaul v. Lucent Tech.*, 134 F.3d 576, 580 (3d Cir. 1998). First, a court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id*. And, second, the court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id*. "The determination of whether an individual with a disability is qualified is made at the time of the adverse employment

decision." *Id.*; *see also Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 563 (7th Cir. 1996).

Plaintiff was not a "qualified individual" for the job he requested as an accommodation (i.e., rail operator) because he did not have the requisite seniority within his division to transfer. SEPTA argues it could not accommodate Plaintiff's request without violating the CBA, and, effectively, the rights of its other employees. This Court agrees. Specifically, it is undisputed that at the time Plaintiff submitted his request, he was number 35 out of 37 on the seniority list for bus-to-rail transfers. Thus, he was not eligible to receive a position as a rail operator. As a member of Local 234, Plaintiff was bound by the CBA between Local 234 and SEPTA. Pursuant to the CBA, the only other way in which Plaintiff could obtain a rail operator position, and subvert the seniority list, is if Local 234's President issued Plaintiff a waiver of the seniority requirement.

However, Plaintiff has not—and cannot—identify any record evidence that indicates the Local 234 President was willing to waive Plaintiff's lack of seniority to accommodate his transfer request. In fact, despite Plaintiff's contention to the contrary, Local 234 President Willie Brown was opposed to the transfer. According to the Third Circuit, "it is appropriate for the union, rather than the employer, to make the determination that the infringement is justifiable by releasing the employer from its obligation to follow the seniority provisions of the

collective bargaining agreement to accommodate a qualified individual with a disability." *Kralik v. Durbin*, 130 F.3d 76, 83 (3d Cir. 1997). Therefore, without the President Brown's approval, SEPTA could not grant Plaintiff's request.[7] In turn, Plaintiff fails to show he was qualified for the position of rail operator, whether by seniority in his division or by waiver of the seniority requirement.

ii. <u>Plaintiff did not suffer an adverse employment action because of his disability.</u>

Even if Plaintiff could establish he was a qualified individual with a disability, he fails to demonstrate he suffered an adverse employment action because of his disability. Plaintiff alleges that (1) SEPTA's denial of his accommodation request to be transferred to rail operator; and (2) SEPTA assigning him to sick leave both constitute adverse employment actions. Specifically, in his sur-reply, Plaintiff states "the adverse action occurred at the latest as of October 1, 2015, when SEPTA failed to accommodate Plaintiff's disability under the ADA but subjected him to involuntary sick leave without pay ... Plaintiff also presented his second request for accommodation on January 27, 2016 ... But was summarily denied the second request, despite the uncontroverted medical records he presented with his second application." ECF No. 45 at 6. Both arguments lack support

---

[7] *See* Footnote 4. In addition, Plaintiff cites to "McKenzie's testimony at Exhibit E, p21, L.6-p.22, L.4," which is missing from the copy he provided. Plaintiff also cites "Bud Scott's testimony at Exhibit G, p.21, L.18-p.23, L.16" and no where in Mr. Scott's deposition does he state "the Union had no objection to waiving its seniority requirement for transferring a bus operator to a trolley operator position for the purpose of accommodating Plaintiff's disabilities under the ADA." *See* ECF No. 45 at 7.

in the record.

First, SEPTA argues it placed Plaintiff on sick leave because Plaintiff represented that it was unsafe for him to drive a bus, not because of his disability. According to SEPTA's Fitness for Duty policy, Mr. Ropars was required to place Plaintiff on sick leave following Plaintiff's disclosure. ECF No. 40-8 at 4-6. In addition, Plaintiff was required to go on sick leave pursuant to the terms of the CBA. ECF No. 40-6 at 24-27. Meanwhile, Plaintiff received all sick benefits to which he was entitled under the CBA in connection with this absence from work, which SEPTA supports with Plaintiff's relevant earnings history. ECF No. 40-8 at 10-22. This evidence demonstrates that SEPTA had a legitimate, nondiscriminatory reason for placing Plaintiff on sick leave, and Plaintiff has not offered any evidence to suggest that SEPTA's reason was pretextual. As such, Plaintiff has failed to adduce evidence from which a reasonable factfinder could conclude discrimination was "more likely than not" the reason for placing him on involuntary sick leave.

Next, Plaintiff argues he suffered an adverse employment action when SEPTA failed to accommodate his disability. ECF No. 43 at 24. Adverse employment decisions barred by the ADA include the failure to make reasonable accommodations for a plaintiff's disabilities. *Mercer*, 26 F.Supp.3d at 445 (quoting *Taylor*, 184 F.3d at 306). The ADA defines discrimination against a qualified

individual on the basis of disability to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). "An employer's denial of a request for a reasonable accommodation is a discrete act of discrimination that is an independently actionable unlawful employment practice under the ADA . . . akin to wrongful termination or failure to hire." *Mercer*, 26 F.Supp.3d at 445 (citing 42 U.S.C. § 12112(b)(5)(A)). Here, Plaintiff did not file a separate cause of action for failure-to-accommodate, but the Court will address it as such.

To establish an ADA failure-to-accommodate claim a plaintiff must show: (1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated. *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)). Here, the record demonstrates Plaintiff was not disabled when he requested an accommodation. Although SEPTA made a good-faith effort to assist, for the reasons discussed above, Plaintiff could not be reasonably accommodated to the position he desired, which was the only

accommodation he would accept.

It is well-settled across the Circuit Courts that a measure that would violate a seniority system established in a collective bargaining agreement is not a "reasonable accommodation," and thus is not required by the ADA. *See Kralik v. Durbin*, 130 F.3d 76, 79 (3d Cir. 1997); *see also Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1052 (7th Cir.1996), *cert. denied*, 520 U.S. 1146, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997); *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir. 1995) ("The ADA does not require that Northwest take action inconsistent with the contractual rights of other workers under a collective bargaining agreement."); *Wooten v. Farmland Foods*, 58 F.3d 382, 386 (8th Cir. 1995) ("An employer is not required to make accommodations that would violate the rights of other employees. Farmland Foods had no obligation to terminate other employees or violate a collective bargaining agreement in order to accommodate Wooten, even if it perceived him to have a substantial impairment.") (citation omitted); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124–25 (10th Cir. 1995) ("An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job. An accommodation that would result in other employees having to work [] harder or longer hours is not required.") (citations omitted); *Shea v. Tisch*, 870 F.2d 786, 790 (1st Cir. 1989) ("Consequently, we ... conclude that the postal service was not required to accommodate plaintiff

further by placing him in a different position since to do so would violate the rights of other employees under the collective bargaining agreement."); *Carter v. Tisch*, 822 F.2d 465, 467 (4th Cir.1987) ("Reassigning Carter to permanent light duty, when he was not entitled to one of a limited number of light duty positions, might have interfered with the rights of other employees under the collective bargaining agreement."). SEPTA correctly argues that the ADA does not require collectively-bargained seniority rights to be compromised in order to reasonably accommodate an employee who is disabled. Accordingly, Plaintiff cannot dispute that SEPTA's refusal to accommodate his request constitutes an adverse employment action.

Again, Plaintiff argues that "the adverse action occurred at the latest as of October 1, 2015, when SEPTA failed to accommodate Plaintiff's disability under the ADA but subjected him to involuntary sick leave without pay." ECF No. 45 at 6. However, the timeline shows SEPTA had not yet decided Plaintiff's first accommodation request, despite Plaintiff's argument to the contrary. SEPTA did not officially deny Plaintiff's accommodation request until December 3, 2015. ECF No. 40-9 at 11. In addition, Plaintiff argues that his "second request for accommodation on January 27, 2016 ... [being] summarily denied [on February 22, 2016] ... despite the uncontroverted medical records he presented this his second application" constitutes an adverse employment action. ECF No. 43 at 24. In support, Plaintiff refers to SEPTA's ADA Reasonable Accommodation Policy and

Reasonable Accommodation Procedure Manual. ECF No. 43-10 at 1-20.

Plaintiff's accommodation request was not reasonable as a matter of law. SEPTA was under no duty to accommodate Plaintiff's specific request to be transferred to rail operator. Plaintiff applied for transfer from bus to rail in March 2014. ECF No. 40-4 at 24. At all times relevant, Plaintiff was subject to the CBA and such transfers were governed by a specific section of the CBA. Plaintiff cites to SEPTA's ADA Accommodation Policy yet conveniently avoids Section E "Undue Hardship," which states, "[w]here a request for accommodation is unreasonable and/or would create an Undue Hardship, SEPTA is not obligated to grant the request ... examples ... "Breach terms and conditions (including seniority rights) of a governing collective bargaining agreement." *Id*. at 5. The Third Circuit maintains, "the plaintiff bears only the burden of identifying an accommodation, the cost of which, facially, do not clearly exceed its benefits." *Walton v. Mental health Ass'n of Southeastern Pa.*, 168 F.3d 661, 670 (3d Cir. 1999). Even if Plaintiff suffered from a disability under the ADA, the only accommodation Plaintiff would accept SEPTA could only grant at the cost of violating the collectively earned rights of Plaintiff's fellow employees.

SEPTA denied both of Plaintiff's accommodation requests after it received Dr. McHugh's IME report, which resolved any ambiguity between doctor reports to date. ECF No. 40-9 at 11. Meanwhile, SEPTA accommodated Plaintiff

following his June 4, 2015 accident when it assigned him to temporary light-duty—a recognized accommodation under ADA.  Nevertheless, Plaintiff pivots quickly to argue his January 27, 2016 request for the same accommodation, without any additional information of substance, was also improperly denied. ECF No. 43-1 ¶ 92.

The Court concludes that SEPTA's reliance on the IME report for Plaintiff's workers' compensation claim was appropriate to resolve any alleged conflict in reports, and Plaintiff's argument stating otherwise lacks support in evidence and law.  With Plaintiff's second request, he attached a new note from Dr. Allen that stated, "Mr. Gardner is cleared to return to work operating trollies only. Not as a bus driver. Thanks." ECF No. 40-9 at 23.  And, history repeats itself when SEPTA received a note from Dr. Allen dated February 10, 2016, stating that Plaintiff was "[c]leared to return to normal duties." *Id*. at 25.  Therefore, when Ms. Hopkins denied Plaintiff's second request on February 22, 2016, she did so again with the IME report and Plaintiff's personal physician's assessment available to her. *Id*. at 27.

In a final, last ditch effort, Plaintiff attempts to exploit SEPTA granting his June 2019 request for a standing work station and suggest that SEPTA's accommodation is somehow evidence that his 2015 request for transfer to rail operator should have been granted. ECF No. 45 at 8.  Plaintiff argues, "[t]his is

evidence from which a reasonable jury could find that SEPTA's 2015 decision that Plaintiff did not have an ADA qualified disability lacks credibility." *Id*.  The Court flatly disagrees.

Ultimately, SEPTA granted Plaintiff's transfer on April 11, 2016, because Plaintiff achieved the requisite seniority, not because of an ADA accommodation. Moreover, Plaintiff continued to achieve promotions from SEPTA, and is currently Control Center Manager – Bus. ECF No. 40-4 at 2.  Based on the record before the Court, no reasonable juror could conclude that Plaintiff suffered an adverse employment action because of his disability when the undisputed facts suggest quite the opposite.

a. *SEPTA engaged Plaintiff in its interactive process.*

Plaintiff argues SEPTA failed to engage Plaintiff in "any interactive process" in relation to his January 2016 accommodation request. ECF No. 43-1 ¶ 90.  Because Plaintiff has failed to show he falls within the scope of an ADA disability, the level of engagement under SEPTA's "interactive-process" is not relevant and the adequacy of SEPTA's process need not be examined. Nevertheless, a brief survey of the record leaves no doubt SEPTA satisfied its duty.

An employer who "acts in bad faith [during] the interactive process will be liable if the jury reasonably concludes that the employee would have been able to perform the job with accommodations." *Taylor*, 184 F.3d at 317.

"To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor*, 184 F.3d at 319–20. The Third Circuit has held that "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith" and must engage in an "interactive process." *Taylor*, 184 F.3d at 312 (quoting *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997)). The record aptly supports SEPTA's contention that the actions taken by Plaintiff throughout this process are nothing more than an orchestrated attempt to circumvent the CBA.

Plaintiff would only accept a transfer to rail operator as an accommodation, which is an accommodation that SEPTA legally could not grant. Ms. Hopkins discussed Plaintiff's request with him over the telephone and explained the difference between identifying a reasonable accommodation for him and the transfer process under the CBA. ECF No. 40-7 at 65-66. Plaintiff memorialized that conversation in a follow-up e-mail to Ms. Hopkins. *Id.*

The interactive process requires participation from both parties. "Each party holds information the other does not have or cannot easily obtain." *Taylor*, 184

F.3d at 316. For example, when presented with Dr. Allen's September 17 and September 30, 2015 notes, the former clearing Plaintiff to work and the latter adding restrictions, Ms. Hopkins asked Plaintiff to clarify *his* personal physicians notes that appeared to be at odds. *Id*. at 75. Plaintiff responded with reports he had submitted with his September 2, 2015 request. ECF No. 40-7 at 79-80; 82-83. As such, Plaintiff's effort was of no remedial consequence.

Plaintiff cites to SEPTA's Reasonable Accommodation Procedure Manual to argue some form of noncompliance. ECF No. 43-1 ¶ 79. The manual outlines SEPTA's process, which includes meeting with the employee. ECF No. 43-10 at 11. On October 7, 2015, Plaintiff attended an interactive process meeting with Ms. Hopkins, Ms. McKenzie, and Dr. Erinoff. ECF No. 40-2 ¶ 6. The record demonstrates that SEPTA considered Plaintiff's request, sought assistance or input from other resources, and attempted to discuss alternatives.

Ms. Hopkins took it upon herself to investigate how much longer Plaintiff "could expect to remain on those transfer lists for the trolley position." *Id*. at 34. Ms. Hopkins engaged Local 234 to inquire if it was willing to waive the seniority system so SEPTA could accommodate Plaintiff's request. *Id*. And, on October 28, 2015, Ms. Hopkins wrote to Plaintiff and summarized the history of the interactive process to date. *Id*. at 36-50. Despite SEPTA not knowing whether Plaintiff suffered from a disability recognized under the ADA, and meanwhile investigating

whether it could not reasonably accommodate Plaintiff's firm request, no reasonable juror could conclude SEPTA failed to engage Plaintiff with a good-faith effort to assist in seeking his accommodation. Any argument to the contrary is fatally undermined by the record.

For all of these reasons, Plaintiff failed to establish a prima facie case for disability discrimination and, accordingly, the Court grants SEPTA's motion for summary judgment on Plaintiff's discrimination claims as a matter of law. As one District Judge put it, "[t]he ADA is not designed to allow individuals to advance to professional positions through a back door. Rather, it is aimed at rebuilding the threshold of a profession's front door so that capable people with unrelated disabilities are not barred by that threshold alone from entering the front door." *Bartlett v. New York State Bd. of Law Examiners*, 226 F.3d 69, 87 (2d Cir. 2000) (citing *Price v. National Bd. Of Medical Examiners*, 966 F. Supp. 419, 421-22 (S.D.W.Va. 1997)). The sequence of events in this case strengthens that District Judge's prior opinion.

B. <u>Plaintiff fails to establish a *prima facie* case for retaliation.</u>[8]

Plaintiff argues that SEPTA retaliated against him for filing an administrative charge and requesting accommodations for his disability. ECF No.

---

[8] Because the anti-retaliation provisions of the ADA and PHRA are substantially similar, the analytical framework is identical. 42 U.S.C. § 12203(a); 43 Pa. Stat. Ann. § 955(d); *Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

43-1 at ¶ 99. The retaliatory action, from Plaintiff's perspective, occurred when SEPTA placed him on involuntary sick leave. ECF No. 43 at 23. Again, courts within the Third Circuit apply a burden-shifting framework to retaliation claims. *Shaner v. Synthes (USA)*, 204 F.3d 494, 500-01 (3d Cir. 2000). "[T]o establish a *prima facie* case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (*Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002). "If an employee establishes a *prima facie* case of retaliation under the ADA, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. *Id*. "If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id*.

For purposes of an ADA retaliation claim, the absence of a disability does not translate into an absence of protection under the ADA. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 190–91 (3d Cir. 2003). The right to request an accommodation in good faith is no less a guarantee under the ADA than the

right to file a complaint with the EEOC, and the ADA protects one who engages in the latter activity without regard to whether the complainant is "disabled." *Id.*

For all of the reasons discussed above, Plaintiff failed to advance evidence that shows a genuine issue of material fact exists as to whether he suffered an adverse employment action. Therefore, his retaliation claim fails, and no further analysis is necessary. For sake of argument, however, Plaintiff has not offered or countered the record with evidence that could show a causal connection between his protected activity and what he claims to be SEPTA's adverse actions.

In order to demonstrate a causal connection, a plaintiff may show (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 271, 280 (3d Cir. 2007). First, SEPTA placed Plaintiff on sick leave before Plaintiff filed his administrative complaint. SEPTA placed Plaintiff on sick leave on September 30, 2015, and Plaintiff filed on October 1, 2015. Therefore, Plaintiff cannot argue that the record points to anything unusually suggestive with regard to timing. Thus, Plaintiff fails to prove the second element for a retaliation claim, quickly.

Next, SEPTA argues Plaintiff's retaliation claim is a "repackaging" of his failure-to-accommodate claim and, as such, fails as a matter of law. ECF No. 44 at 18. The Court agrees. However, and although the Court analyzed it as such,

Plaintiff did not present a separate failure-to-accommodate claim. Instead, Plaintiff argued SEPTA's failure-to-accommodate as an adverse employment action under the elements of his discrimination claim, which it was not.

SEPTA cites *Williams v. Philadelphia Hous. Auth.*, 230 F. Supp. 2d 631, 639 (E.D. Pa. 2002), as persuasive support. In *Williams,* the District Court granted summary judgment to the employer where plaintiff predicated an ADA retaliation claim on the employer's denial of a request for accommodation. *Garner v. Sch. Dist. of Philadelphia*, 63 F. Supp. 3d 483, 500 (E.D. Pa. 2014) (citing *Williams v. Philadelphia Hous. Auth.*, 230 F. Supp. 2d 631, 639 (E.D. Pa. 2002), aff'd in part, rev'd in part sub nom. *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751 (3d Cir. 2004)). In granting summary judgment on the plaintiff's retaliation claim, the Court stated that the "[p]laintiff's claim, to the extent it is based upon the defendant's denial of his request for a reasonable accommodation, is stated as a retaliation claim in form, is, in substance, a claim of failure to accommodate." *Id*.

Here, it appears Plaintiff's retaliation claim is based, at least in part, upon SEPTA's refusal to accommodate his specific accommodation, and it cannot be presented as a separate claim. It appears Plaintiff blends his seeking accommodation with his being placed on involuntary sick leave. Regardless, for the same reasons Plaintiff fails to establish a failure-to-accommodate claim, he also fails to establish a claim for retaliation.

No reasonable juror could conclude that the legitimate non-discriminatory reason SEPTA offers – Plaintiff was placed on sick leave because he submitted an accident/incident report to Mr. Ropars that stated he could not safely drive a bus – was for pretextual reasons. As explained, SEPTA presented evidence that it could not forego placing Plaintiff on sick leave without violating the CBA or its own internal policy. As outlined above, Plaintiff offers nothing to show SEPTA's stated reason for placing Plaintiff on involuntary sick leave was false.

SEPTA's ability to exercise its own judgment when enforcing its contractual obligations under the CBA, as well as its own policies, especially when one considers it transports the public, must be given deference. Without more, the record supports a finding in favor of SEPTA on Plaintiff's retaliation claim.

## IV.    CONCLUSION

The Courts finds that Plaintiff has not made out a *prima facie* case of discrimination under the ADA. Plaintiff's request for transfer to a rail position was not a reasonable accommodation under the ADA because it would require SEPTA to violate the explicit terms of the CBA. The Court also finds that SEPTA more than adequately engaged in the ADA mandated good faith interactive process with Plaintiff concerning his disability. Therefore, no reasonable jury, viewing the complete record in a light most favorable to Plaintiff, could find that SEPTA

violated his rights under the ADA. The Court grants summary judgment in favor of SEPTA as to the claim of discrimination under the ADA and the PHRA.

The Court finds that the evidence of record does not support Plaintiff's retaliation claim against SEPTA. The undisputed timeline rejects Plaintiff's assertion that SEPTA retaliated against him for filing his charge or for requesting his accommodations when it placed him on involuntary sick leave and, further, Plaintiff cannot repackage his failure to accommodate claim into a separate claim for retaliation. Therefore, the Court grants summary judgment in favor of SEPTA as to the retaliation claims.

Accordingly, the Court grants summary judgment in favor of SEPTA as to all of Plaintiff's causes of action.

**BY THE COURT:**

10-17-2019

**CHAD F. KENNEY, JUDGE**